FILED

MAR 26 2020

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                        DEPUTY

# United States District Court

FOR THE

_Western_ **District of Texas**

Name _Carlos Flores_                    §

as a member of The ASSOCIATION          §

OF TEXAS NONCUSTODIAL                    §    Cause Number: _7.20-CV-80_

PARENTS                                 §

   v                                    §

Chief Justice Nathan Hecht

and the other members of the

Texas Supreme Court

---

## PLAINTIFFS' EMERGENCY MOTION FOR DECLARATORY RELIEF FROM A VOID JUDGMENT AND REQUEST FOR SUMMARY JUDGMENT

---

### Certificate of Conference

Conference with the Defendants was unavailable due to the emergency nature of the claim. The Defendants are not readily available to the Plaintiff for conference without extreme burden upon the Plaintiff.

**This Petition Asks The Court To Consider The Following Issues:**

I.  **Does SCOTX Possess Powers Vested Only With The Texas Legislature?**

II.  **The Memo Contradicts A Previous Ruling Made By SCOTX.**

III.  **Can SCOTX Deny Due Process Rights To The Entire Population Of Texas Parents?**

**Plaintiff**

Name _Carlos Flores_

Address _6130 Fig St. #4_

_Odessa, TX 79766_

Email _carlosfl71@sbcglobal.net_

Phone. _432-352-6317_

**Respondents**

Nathan Hecht and the other 8 members of the Supreme Court of Texas.

**Physical Location**
Supreme Court of Texas
Supreme Court Building
201 W. 14th Street, Room 104
Austin, Texas 78701
**Mailing Address**
Supreme Court of Texas
PO Box 12248
Austin, Texas 78711

FRCP 7.1 There is no corporation that requires disclosure.

## JURISDICTION

The actions of the SCOTX constitute a violation of 14th amendment rights regarding the parent child relationship. The SCOTX did not allow litigants to have the opportunity to litigate this issue. The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law. Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) (quoting Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1107 (9th Cir. 2001)). The actions of SCOTX constitute a lack of fundamentally fair procedures. Id. (quoting Santosky v. Kramer, 455 U.S. 745, 754 (1982)) (emphasis in original). Because SCOTX is the highest court of appeals in the State of Texas, the only other recourse for violation of constitutional rights is to seek remedy in the Federal Courts. The SCOTX actions that give rise to this complaint are subject to no further review or correction in any other state tribunal and are final as an effective determination and not of merely interlocutory or intermediate steps. It is the final word of a final court.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

School districts in Texas have extended the Spring Break vacation in response to the Corona Virus. Sadly in an effort to keep parents from enjoying these extended periods of possession, the Texas Supreme Court (SCOTX) unanimously signed an order (Misc. Docket 20-9043) (aka Memo) (Exhibit A) on March 17, 2020. SCOTX utilized powers vested only with the Texas Legislature. The Memo had the effect of enacting or revising Texas law governing the custody schedule for spring break in 2020. The Memo also contradicts a prior ruling by the SCOTX. The Memo contradicts Texas public policy. The Memo violated 14th amendment due process rights because it had the effect of

modifying all custody and support orders in existence without due process. The Plaintiff was not given a right to a hearing or other due process in regards to the SCOTX memo.

Regretfully the Memo is unconstitutional and VOID.

## A.  What Did the SCOTX Memo Say?

The SCOTX memo contains the following directive: *"For purposes of determining a person's right to possession of and access to a child under a court-ordered possession schedule, the original published school schedule shall control in all instances. Possession and access shall not be affected by the school's closure that arises from an epidemic or pandemic, including what is commonly referred to as the COVID19 pandemic."*

Please note that *"Possession and access shall not be affected by the school's closure that arises from an epidemic or pandemic"* is not contained in any Texas law. SCOTX made that one up.

## B.  Unfortunately, The Memo Is Void Because SCOTX Utilized Powers That Belong Only To The Texas Legislature.

1.  The Texas Constitution Article 3 contains the powers that belong to the Texas Legislature. Sections 29, 30, and 31 in Article 3 only give the Texas Legislature the power to enact laws.

2.  Sec. 29.  ENACTING CLAUSE OF LAWS.  *The enacting clause of all laws shall be: "Be it enacted by the Legislature of the State of Texas."*  Therefore, all laws are to be enacted by the Legislature of Texas. This section speaks for itself.

3.  Sec. 30.   LAWS PASSED BY BILL; AMENDMENTS CHANGING PURPOSE PROHIBITED. *No law shall be passed, except by bill, and no bill shall be so amended in its passage through either House, as to change its original purpose.* Simply, a Law must start as a Bill.

4.  Article 3 Sec. 31.  ORIGINATION IN EITHER HOUSE; AMENDMENT.  *Bills may originate in either House, and, when passed by such House, may be amended, altered or rejected by the other.* Therefore, Texas laws must start out as a bill and those bills must originate in either the Texas House of Representative or the Texas Senate. There is no authority given to SCOTX authorizing SCOTX to issue Bills and then turn those Bills into law.

5.  Only the Texas legislature can enact laws and those laws must start as a bill and be accepted through the regular course of business for the enactment of a law. The memo issued by the SCOTX has the same effect as a new law or a revision of the law and thus violates the separation of powers.

6.  "Article 1 Section 28 SUSPENSION OF LAWS. No power of suspending laws in this State shall be exercised except by the Legislature." SCOTX cannot suspend laws.

7.   The memo relied upon Texas Government Code 22.035(b)[1] to support the revision of law/modification of custody orders. In this case, no conduct of court proceedings is referenced in this order. It is simply stating that *"possession and access shall not be affected by the school's closure" (memo, page 1)*. SCTOX can only suspend certain provisions relating to COURT PROCEEDINGS, but the Memo seeks to suspend, enact, or revise the LAW but only the Texas legislature can suspend the laws.

8.   The Texas Legislature has held no session to address the "Corona Break" issue nor have they revised Texas Family Code 153.312. Did the Supreme Court of Texas assume the powers of the Texas Legislature when they issued this memo?

## C. The Memo Contradicts What SCOTX Previously Said About Interpreting Laws.

1.   Let's examine what SCOTX said concerning how they read and interpret a law. Iliff v Iliff, No. 09–0753, was a case that came before SCOTX in 2011 and here is what they said: (Exhibit B).

*B. Statutory Construction*

---

[1] Tex. Government Code Sec. 22.0035. MODIFICATION OR SUSPENSION OF CERTAIN PROVISIONS RELATING TO COURT PROCEEDINGS AFFECTED BY DISASTER. (a) In this section, "disaster" has the meaning assigned by Section 418.004.
(b) Notwithstanding any other statute, the supreme court may modify or suspend procedures for the conduct of any court proceeding affected by a disaster during the pendency of a disaster declared by the governor. An order under this section may not extend for more than 90 days from the date the order was signed unless renewed by the chief justice of the supreme court.

*In construing a statute, the court's purpose is to give effect to the Legislature's expressed intent. "Our role is not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent ." McIntyre v. Ramirez, 109 S.W.3d 741, 748 (Tex.2003). Where statutory language is unambiguous and only yields one reasonable interpretation, "we will interpret the statute according to its plain meaning." Id; see also City of Rockwall v. Hughes, 246 S.W.3d 621, 625–26 (Tex.2008) ("[W]e construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." (internal citations omitted)).*

2.  Spring Break is governed by Texas law 153.312 [2]. Please note that nothing in this law mentions "school calendar".

---

[2] Texas Family Code Sec. 153.312 PARENTS WHO RESIDE 100 MILES OR LESS APART. (a) If the possessory conservator resides 100 miles or less from the primary residence of the child, the possessory conservator shall have the right to possession of the child as follows: …
(b)(1) the possessory conservator shall have possession in even-numbered years, beginning at 6 p.m. on the day the child is dismissed from school for the **school's spring vacation and ending at 6 p.m. on the day before school resumes after that vacation,** and the managing conservator shall have possession for the same period in odd-numbered years;"

3.   The Legislature's expressed intent isn't just that parents have possession of their children for spring break. The Legislature's intent is to to respect the relationship between parents and children is actually mentioned in another Texas law 153.001 [3].

4.   Since statutory language is another way of saying the language contained in the law, and Texas law mentioned above is clear and only has one reasonable interpretation, SCOTX should interpret the law according to its plain meaning: **children are to be returned the day before school resumes after spring break.**

5.   Parents who have their children for spring break in 2020 only get to have their children 95-110 days every year. The reader must examine Texas law 153.312 in detail in order to actually discover this fact, but a calendar has been provided as (Exhibit C) to ease the burden.

6.   Since Texas Public Policy is to encourage frequent and continuing contact between parents and children, and parents currently in possession of their children for spring bring only get to have contact with their children 26% of a given year, it would be obvious that the extension to spring break would favor these parents in keeping there children with them until school resumes. It is saddening that their own government should want to keep them from enjoying the company of their children a bit longer.

---

[3]Texas Family Code Sec. 153.001.  PUBLIC POLICY.  (a)  The public policy of this state is to:
(1)  **assure that children will have frequent and continuing contact with parents** who have shown the ability to act in the best interest of the child; (2)  provide a safe, stable, and nonviolent environment for the child;  and (3)  encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

**D. The Memo Violates 14th Amendment Due Process Rights From Interference With Parent-Child Relationships And Is VOID.**

1. Parents and children possess a constitutionally protected liberty interest in companionship and society with each other. Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987). In Kelson v. City of Springfield, 767 F.2d 651 (9th Cir. 1985), the Ninth Circuit held that the state's interference with such liberty interest without due process of law is cognizable under 42 U.S.C. § 1983.

2. As per the Texas Code of Judicial Canons 3B(8) "A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." At no point was public notice given regarding this decision being made by SCOTX. The citizens of Texas were given no opportunity to be heard regarding their thoughts and opinions. Sadly, the parents affected by this situation have been given no opportunity to be heard by a judge. Instead a secret closed door meeting was held that effectively rewrote their custody orders.

3. Unfortunately, the memo has the effect of modifying/revising Texas Family Code Sec. 153.312. Texas law requires that custody orders contain the language of the law in order to be enforceable. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any

State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## E. Remedy

1. Plaintiff seeks this Court to issue declaratory relief in the form of a summary judgement in favor of the Plaintiff. Such relief shall declare that the SCOTX (Misc. Docket 20-9043) (aka memo) is an unconstitutional order and VOID.

Name _Carlos Flores_

Signature _Carlos Flores_

Address _6130 Fig St. #4_

_Odessa, TX 79766_

Email _carlosf171@sbcglobal.net_

Phone. _432-352-6317_

## EXECUTED WITHIN THE UNITED STATES ITS TERRITORIES, POSSESSIONS, OR COMMONWEALTHS

## 28 U.S. CODE § 1746. UNSWORN DECLARATIONS UNDER PENALTY OF PERJURY

"I declare under penalty of perjury that the foregoing is true and correct. Executed on

__25__ day of __March__ in the year __2020__.

_____ (signature)".

__Carlos Flores__ (printed name)

Exhibit A

# IN THE SUPREME COURT OF TEXAS

Misc. Docket No. 20-9043

## SECOND EMERGENCY ORDER REGARDING
## THE COVID-19 STATE OF DISASTER

**ORDERED** that:

1.  Governor Abbott has declared a state of disaster in all 254 counties in the State of Texas in response to the imminent threat of the COVID-19 pandemic. This order is issued pursuant to Section 22.0035(b) of the Texas Government Code.

2.  This order applies to and clarifies possession schedules in Suits Affecting the Parent–Child Relationship. For purposes of determining a person's right to possession of and access to a child under a court-ordered possession schedule, the original published school schedule shall control in all instances. Possession and access shall not be affected by the school's closure that arises from an epidemic or pandemic, including what is commonly referred to as the COVID-19 pandemic.

3.  Nothing herein prevents parties from altering a possession schedule by agreement if allowed by their court order(s), or courts from modifying their orders.

4.  This Order is effective as of March 13, 2020, and expires May 8, 2020, unless extended by the Chief Justice of the Supreme Court.

5.  The Clerk of the Supreme Court is directed to:

    a.  post a copy of this Order on www.txcourts.gov;

    b.  file a copy of this Order with the Secretary of State; and

    c.  send a copy of this Order to the Governor, the Attorney General, and each member of the Legislature.

6.     The State Bar of Texas is directed to take all reasonable steps to notify members of the Texas bar of this Order.


Dated: March 17, 2020

_____
Nathan L. Hecht, Chief Justice

_____
Paul W. Green, Justice

_____
Eva M. Guzman, Justice

_____
Debra H. Lehrmann, Justice

_____
Jeffrey S. Boyd, Justice

_____
John P. Devine, Justice

_____
James D. Blacklock, Justice

_____
J. Brett Busby, Justice

_____
Jane N. Bland, Justice

Exhibit B

Search FindLaw

(https://lp.findlaw.com/)

Cases & Codes (https://caselaw.findlaw.com/)   Practice Management (https://practice.findlaw.com/)   Legal Technology (htt

FINDLAW (HTTPS://LP.FINDLAW.COM/)   /   CASELAW (HTTPS://CASELAW.FINDLAW.COM/)   /   TEXAS (HTTPS://CASELAW.FINDLAW.COM/COURTS/TEXAS)   /
TX SUPREME CT. (HTTPS://CASELAW.FINDLAW.COM/COURT/TX-SUPREME-COURT)   /   ILIFF V. ILIFF

# ILIFF v. ILIFF

Print                                                                                          Font size:   A   A   Reset

## Supreme Court of Texas.

## James Derwood ILIFF, Petitioner, v. Jerilyn Trije ILIFF, Respondent.

## No. 09–0753.

## Decided: April 15, 2011

Thomas M. Michel, Griffith, Jay & Michel, Fort Worth, TX, Georganna L. Simpson, Jeremy C. Martin, Simpson Martin LLP, Dallas, TX, Robert E. Raesz Jr., Law Offices of Robert E. Raesz, Jr., Austin, TX, Sarah Katherine Brandon, Law Offices of Sarah Brandon, Austin, TX, Lucy E. Del Prado 'Elly' Dietz, Duvall Gruning & Dietz, San Marcos, TX, for Petitioner. Frank B. Suhr, Law Office of Frank B. Suhr, New Braunfels, TX, Michael E. Scanio, Scanio & Scanio, San Marcos TX, for Respondent.

Under the Texas Family Code, may a trial court calculate child support based on earning potential, rather than actual earnings, when the obligor is intentionally unemployed or underemployed, but there is no proof that the obligor's unemployment or underemployment is for the purpose of avoiding child support? Because the language of Texas Family Code section 154.066 does not require such proof, we hold that intent to avoid child support need not be proven for the trial court to apply the child support guidelines to earning potential instead of actual earnings. However, a trial court may properly consider an obligor's intent to avoid child support as a factor, along with other relevant facts, in an intentional unemployment or underemployment analysis. We affirm the judgment of the trial court and the court of appeals.[1]

I. Factual and Procedural Background

Jerilyn Trije Iliff and James Derwood Iliff married April 7, 1990 and had three children. During their marriage James was the primary earner, working in the chemical industry as a chemical specialist and account manager. Although there was some dispute during the divorce proceedings over the amount of his salary, Jerilyn testified James usually made $90,000 to $100,000 a year, and James's W–2 for the year prior to the divorce showed earnings of $102,000. James quit his job in January 2006. After leaving his employment in the chemical industry, James had no steady gainful employment during the divorce proceedings. Despite the fact that James has Bachelor of Science and Master of Business Administration degrees and admits that he is not disabled and is fit to work, James's only work since quitting his job consisted of operating a tractor and sporadic business management consulting for an estimated total earnings of $3,600 to $4,800 over a two-year period.

Stay up to date with

Please enter your email address                                    Subscribe

Jerilyn filed for divorce on June 28, 2006 in Hays County, six months after James resigned. The trial court entered the final divorce decree on May 5, 2008. The trial court appointed Jerilyn sole managing conservator of the children. James was appointed possessory conservator and was ordered to pay child support. Because the trial court determined that James was intentionally unemployed or underemployed, the trial court exercised its discretion and applied the child support guidelines to James's earning potential, as opposed to his actual earnings. See Tex. Fam.Code § 154.066 (allowing the trial court to set child support based on earning potential where an obligor is intentionally underemployed). The trial court's findings of fact and conclusions of law state:

James Derwood Iliff's own testimony at trial showed that he made in excess of $100,000 in earnings in 2005, the year immediately prior to the filing of divorce. James Derwood Iliff testified at trial that he had left his employment voluntarily in December of 2005. He further testified that he was not disabled or unable to work and had plans to start his own business.

Determining that James's monthly gross earning potential was no less than $5,000, the trial court calculated James's net resources to be $3,662.09 a month and ordered James to pay $1,295.19 per month in child support for his three minor children.

At the court of appeals, James argued that the trial court abused its discretion by awarding child support in excess of the statutory guidelines because there was no evidence that James was intentionally unemployed or underemployed for the purpose of avoiding child support. Iliff v. Iliff, ---S.W.3d ---- (Tex.App.-Austin 2009, pet. granted). The court held that the trial court did not abuse its discretion, rejecting James's argument that the trial court was required to find that his unemployment or underemployment was for "the primary purpose of avoiding child support." Id. While acknowledging that other Texas courts of appeals impose a requirement that intentional unemployment or underemployment be for the primary purpose of avoiding child support, the court reasoned that the language of section 154.066 does not require a court to consider avoidance of child support. Id. (citing Hollifield v. Hollifield, 925 S.W.2d 153, 156 (Tex.App.-Austin 1996, no writ)). We granted Jerilyn's petition to resolve the split among the courts of appeals. Compare Hollifield, 925 S.W.2d at 156 ("Section 154.066 does not require the court to consider whether the obligor's 'voluntary unemployment' was for the primary purpose of avoiding child support."), with DuBois v. DuBois, 956 S.W.2d 607, 610 (Tex.App.-Tyler 1997, no pet.) ("[T]here must be evidence that the parent reduced his income for the purpose of decreasing his child support payments.").

## II. Standard of Review

A trial court has discretion to set child support within the parameters provided by the Texas Family Code. Rodriguez v. Rodriguez, 860 S.W.2d 414, 415 (Tex.1993); see also Tex. Fam.Code §§ 154.121-.123. "A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion." Worford v. Stamper, 801 S.W.2d 108, 109 (Tex.1990) (per curiam) (citation omitted); see also Rodriguez, 860 S.W.2d at 415. A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or principles. Worford, 801 S.W.2d at 109; Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.1985). A trial court also abuses its discretion by failing to analyze or apply the law correctly. Walker v. Packer, 827 S.W.2d 833, 840 (Tex.1992).

## III. Law and Analysis

Texas Family Code section 154.066 provides that "[i]f the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor." TEX. FAM. CODE § 154.066. The question this case presents is: In order to set child support based upon earning potential of the obligor under section 154.066, must the trial court determine that the obligor's unemployment or underemployment is for the purpose of reducing child support?

## A. Disagreement Among the Courts of Appeals

Twelve of the fourteen Texas courts of appeals have answered this question in the affirmative, interpreting Texas Family Code section 154.066 to require proof that the obligor is intentionally unemployed or underemployed for the purpose of avoiding child support. See, e.g., DuBois, 956 S.W.2d at 610. Prior to the Tyler Court of Appeals holding in DuBois, there was no uniform interpretation of "intentional unemployment or underemployment." Compare Baucom v. Crews, 819 S.W.2d 628, 633 (Tex.App.-Waco 1991, no writ) (setting child support based on earning potential simply because the obligor "voluntarily became underemployed by choosing to resign from the employment he had"), with Woodall v. Woodall, 837 S.W.2d 856, 858 (Tex.App.-Houston [14th Dist.] 1992, no writ) (requiring evidence that the obligor's "income reduction was designed to obtain a decrease in his child support obligation"). After 1997, the vast majority of the Texas courts of appeals adopted the DuBois rule and began to consistently recite its "intent to avoid child support" standard.[2]

Although many of the courts of appeals cases recite the DuBois standard, they loosely apply it, providing little or no analysis of how the particular facts of the case indicate a parent's intent to avoid child support. For example, in Schaben–Maurer v. Maurer–Schaban, a husband was unemployed for six years before his wife filed for divorce, because, as the wife testified, "[the husband] simply liked sleeping late into the day, watching television, playing on the computer all night, and not having to go to a job." 238 S.W.3d 815, 827 (Tex.App.-Fort Worth 2007, no pet.). The court of appeals did not examine any evidence that the husband was unemployed for the purpose of avoiding child support, but relied on evidence that the husband did not want to hold down a job. Id. After citing the DuBois standard, the court of appeals held that the husband was intentionally underemployed. Id . at 827–28. But the deficiency in this conclusion is the failure to actually apply DuBois—a parent cannot be unemployed for the purposes of avoiding child support when the parent became voluntarily unemployed six years before the divorce. Straying from strict adherence to a purpose requirement, many courts of appeals infer intent to avoid child support from "such circumstances as the parent's education, economic adversities, business reversals, business background, and earning potential." See, e.g., Garner v.. Garner, 200 S.W.3d 303, 307 (Tex.App.-Dallas 2006, no pet.) (citing In re P.J.H., 25 S.W.3d at 406). Innocuous facts such as a graduate degree or past jobs are not particularly indicative of a parent's motive or intent to avoid child support obligations.

To interpret "intentional unemployment or underemployment," we first turn to the text of the statute.

B. Statutory Construction

In construing a statute, the court's purpose is to give effect to the Legislature's expressed intent. "Our role . is not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent ." McIntyre v. Ramirez, 109 S.W.3d 741, 748 (Tex.2003). Where statutory language is unambiguous and only yields one reasonable interpretation, "we will interpret the statute according to its plain meaning." Id; see also City of Rockwall v. Hughes, 246 S.W.3d 621, 625–26 (Tex.2008) ("[W]e construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." (internal citations omitted)).

Section 154.066 gives a trial court discretion to set child support based on the obligor's earning capacity where "the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment." Tex. Fam.Code § 154.066.[3] Looking to the grammatical structure of the statute, the adjective "intentional" proceeds the phrase "unemployment or underemployment" and thus modifies that phrase. See McIntyre, 109 S.W.3d at 746 (quoting, among others, Long v. United States, 199 F.2d 717, 719 (4th Cir.1952)) (reasoning that an adverb preceding two verbs connected with the disjunctive conjunction "or" applies to both verbs); Lewis v. Jackson Energy Coop. Corp., 189 S.W.3d 87, 92 (Ky.2005) ("[T]he first adjective in a series of nouns or phrases modifies each noun or phrase in the following series unless

another adjective appears."). "Intentional" cannot be said to modify "reduction of child support obligations," a phrase not contained in the section. The Legislature did not include in the statute any mention of "purpose," "design," or even "intent" to avoid or reduce child support.

There must be a finding that the obligor is intentionally unemployed or underemployed, meaning an obligor consciously chooses to remain unemployed or underemployed. But there is nothing in the statute requiring further proof of the motive or purpose behind the unemployment or underemployment.[4] "We have no right to engraft upon the statute any conditions or provisions not placed there by the legislature." Duncan, Wyatt & Co. v. Taylor, 63 Tex. 645, 649 (1885). Because section 154.066 is unambiguous, we decline to read into the statute an extra proof requirement that the Legislature did not express. See Lee v. City of Houston, 807 S.W.2d 290, 294–95 (Tex.1991) ("A court may not judicially amend a statute and add words that are not implicitly contained in the language of the statute." (citation omitted)).

C. Application of Texas Family Code Section 154.066

The trial court has the discretion to apply the support guidelines to the earning potential of an obligor if it determines an obligor is intentionally unemployed or underemployed.[5] Section 154.066 simply states that a trial court may apply the child support guidelines to the earning potential of the obligor in an intentional unemployment or underemployment situation. See Tex. Gov't Code § 311.016(1) (" 'May' creates discretionary authority or grants permission or power."); Dallas Cnty. Cmty. Coll. Dist. v. Bolton, 185 S.W.3d 868, 874 (Tex.2005) (noting that the word "may" should be given its permissive meaning). While the permissive word "may" imports the exercise of discretion, "the court is not vested with unlimited discretion, and is required to exercise a sound and legal discretion within the limits created by the circumstances of a particular case." Womack v. Berry, 291 S.W.2d 677, 683 (Tex.1956). Moreover, in child support decisions, the "paramount guiding principle" of the trial court should always be the best interest of the child. See Rodriguez, 860 S.W.2d at 417 n. 3.

Although a trial court properly considers whether an obligor parent is unemployed or underemployed for the purpose of avoiding child support, the inquiry under section 154.066 should not be so narrowly circumscribed. While the trial court may consider whether the obligor is attempting to avoid child support by becoming or remaining unemployed or underemployed as a factor in its child support determination, such proof is not required for a court to be able to set child support based on earning potential. However, in certain cases, such evidence may be especially relevant or even dispositive of the matter.

The law has long recognized parents have a legal duty to support their children during their minority. In re Henry, 154 S.W.3d 594, 596 (Tex.2005) (per curiam); Ex Parte Hall, 854 S.W.2d 656, 658 (Tex.1993); Eggemeyer v. Eggemeyer, 554 S.W.2d 137, 138 (Tex .1977); see also Yarborough v. Yarborough, 290 U.S. 202, 221 (1933) ("[I]n order that children may not become public charges the duty of maintenance is one imposed primarily upon the parents, according to the needs of the child and their ability to meet those needs."). A parent who is qualified to obtain gainful employment cannot evade his or her child support obligation by voluntarily remaining unemployed or underemployed. See Eggemeyer v. Eggemeyer, 535 S.W.2d 425, 427–28 (Tex.Civ.App.- Austin 1976), aff'd, 554 S.W.2d 137 (Tex.1977). Concurrently, the court must consider "a parent's right to pursue his or her own happiness," In re E.A.S., 123 S.W.3d 565, 570 (Tex.App.-El Paso 2003, pet. denied), with a parent's duty to support and provide for his or her child. The court must engage in a case-by-case determination to decide whether child support should be set based on earning potential as opposed to actual earnings. Once the obligor has offered proof of his or her current wages, the obligee bears the burden of demonstrating that the obligor is intentionally unemployed or underemployed.[6] The burden then shifts to the obligor, if necessary, to offer evidence in rebuttal.

Trial courts should be cautious of setting child support based on earning potential in every case where an obligor makes less money than he or she has in the past. James argues that application of section 154.066 will lead to absurd consequences by preventing parents from ever selecting a job which provides a lower income. However, the Legislature addressed this concern,

in part, by limiting the application of the statute only to situations where the obligor makes "significantly less" money because of intentional unemployment or underemployment. Tex. Fam.Code § 154.066. We are wary of the proposition presented by the Attorney General that, other things being equal, receiving more child support will always be in the best interest of the child. Although some financial resources are indispensable to raising and providing for a child, the financial analysis will often not be the end of the court's consideration.[7] A court properly considers the obligor's proffered rebuttal evidence of the reasons for an obligor's intentional unemployment or underemployment. This includes such laudable intentions by obligors who alter their employment situations to spend more time with their children, to live closer to their children in order to attend their events and be more involved in their lives, or to provide their children with better health benefits. Other objectives are also factors, such as whether an obligor alters his or her employment situation to start a new business, to gain further education, to become a public servant, or to address health needs. An active but unfruitful pursuit of employment may also be relevant to the court's child support determination, as well as economic conditions that legitimately preclude full employment. But, we are mindful that such explanations are not always sincere, and the judge as fact finder has latitude to consider the testimony and evidence to make the necessary determinations. See Murff v. Murff, 615 S. W.2d 696, 700 (Tex.1981). Such discretion must be exercised within the limits set by the Texas Family Code, particularly Chapter 154 including the child support guidelines, and should always focus on the best interest of the child. To facilitate appellate review and to encourage consistency in the exercise of this discretion across the state, the trial court must make a finding of intentional unemployment or underemployment and its decision to base child support on earnings potential rather than actual earnings must be supported by the record.

D. Application of Section 154.066 to the Trial Court's Child Support Determination

During the Iliffs' divorce trial, the court heard testimony that James voluntarily quit a job making $102,000 a year. After leaving his job, James moved in with his mother who testified that James did not help out with any household expenses or the upkeep of the house but instead spent most of his time reading and watching television. James's sister testified that James was not incapacitated or incompetent, he had no gainful employment since 2006, and he was usually watching television when she visited him. Despite having a B.S., an M.B.A., and almost twenty years' experience in the chemical industry, the only employment James had over the two-year period during his divorce included operation of a tractor and some consulting work for an estimated $200 a month. Although Jerilyn testified to possible alcohol abuse and psychological issues, James refused to comply with the recommended treatment after a court ordered neurological evaluation and further refused to undergo a court ordered psychological evaluation. James admitted to being able to work, however there was little evidence that James had actively sought other comparable employment after his tractor business foundered. On this record, the trial court issued a finding that James was intentionally underemployed and set James's child support payments based on an earning potential of $5,000 a month, or $60,000 a year, $42,000 less than James's salary from the job he voluntarily left. See Montgomery Indep. Sch. Dist. v. Davis, 34 S.W.3d 559, 567 (Tex.2000) (noting that the trial court, as fact finder, "is the sole judge of the witnesses' credibility and the weight to be given their testimony, and is free to resolve any inconsistencies" (citation omitted)). Applying the standard elucidated above, we hold the trial court did not abuse its discretion in its child support determination.

IV. Conclusion

Texas Family Code section 154.066 contains no requirement of proof that an obligor be intentionally unemployed or underemployed for the purposes of avoiding child support. Where a trial court determines that an obligor is intentionally unemployed or underemployed, it is in the court's discretion to set child support based on earning potential. The trial court did not abuse its discretion in setting James's child support based on his earning potential. We affirm the judgment of the court of appeals and disapprove of courts of appeals opinions to the extent they require proof of intent to avoid child support.[8]

FOOTNOTES

1. The Attorney General of Texas submitted an amicus curiae brief in support of Jerilyn Iliff.

2. See, e.g., In re B.R., 327 S.W.3d 208, 213 (Tex.App.-San Antonio 2010, no pet.); Romero v. Zapien, No. 13–07–00758–CV, 2010 WL 2543897, at *6 (Tex.App.-Corpus Christi–Edinburg June 24, 2010, pet. denied); Fondren v. Fondren, No. 09–08–00187–CV, 2009 WL 2045252, at *5 (Tex.App.-Beaumont July 16, 2009, no pet.); In re A.B.A.T.W., 266 S.W.3d 580, 585 (Tex.App.-Dallas 2008, no pet.); McLane v. McLane, 263 S.W.3d 358, 362 (Tex.App.-Houston [1st Dist.] 2008, pet. denied); Schaban–Maurer v. Maurer–Schaban, 238 S.W.3d 815, 826 (Tex.App.-Fort Worth 2007, no pet.); Beach v. Beach, No. 05–05–01316–CV, 2007 WL 1765250, at *4 (Tex.App.-Dallas June 20, 2007, no pet.); In re Marriage of Anderson, No. 10–06–00361–CV, 2007 WL 3409294, at *3 (Tex.App.-Waco Nov. 14, 2007, no pet.); In re S.C.S., 201 S.W.3d 882, 889 (Tex.App.-Eastland 2006, no pet.); Garner v. Garner, 200 S.W.3d 303, 306–07 (Tex.App.-Dallas 2006, no pet.); Logan v. Logan, No. 2–05–068–CV, 2006 WL 2167164, at *6 (Tex.App.-Fort Worth Aug. 3, 2006, pet. denied); Colvin v. Colvin, No. 13–03–00034–CV, 2006 WL 1431218, at *5 (Tex.App.-Corpus Christi–Edinburg May 25, 2006, pet. denied); Gaxiola v. Garcia, 169 S.W.3d 426, 432 (Tex.App.-El Paso 2005, no pet.); In re A.J.J ., No. 2–04–265–CV, 2005 WL 914493, at *3 (Tex.App.-Fort Worth April 21, 2005, no pet.); In re J.C.S., No. 06–04–00085–CV, 2005 WL 927173, at *5 (Tex.App.-Texarkana April 18, 2005, no pet.); In re E.A.S., 123 S.W.3d 565, 570 (Tex.App.-El Paso 2003, pet. denied); In re Z.B.P., 109 S.W.3d 772, 783 (Tex.App.-Fort Worth 2003, no pet.); Zorilla v. Wahid, 83 S.W.3d 247, 253 (Tex.App.-Corpus Christi–Edinburg 2002, no pet.); Galarza v. Galarza, No. 13–99–797–CV, 2000 WL 35729667, at *2 (Tex.App.-Corpus Christi–Edinburg Nov. 30, 2000, no pet.); In re P.J.H., 25 S.W.3d 402, 405–06 (Tex.App.-Fort Worth 2000, no pet.); Snell v. Snell, No. 11–98–00126–CV, 1999 WL 33747973, at *2 (Tex.App.-Eastland Nov. 4, 1999, no pet.).

3. The Legislature originally enacted this statute in 1989 and amended it as currently worded in 1995. The prior version, section 14.053(f), had slightly different language but is substantively indistinguishable: "If the actual income of the obligor is significantly less than what the obligor could earn because the obligor is intentionally unemployed or underemployed, the court may apply these guidelines to the earning potential of the obligor." Act of May 12, 1989, 71st Leg., R.S., ch. 617, § 6, 1989 Tex. Gen. Laws 2030, 2037, amended by Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 160 (current version at Tex. Fam.Code § 154.066) (emphasis added). James argues that because several cases before the statute's recodification required proof of an intent to avoid child support, the Legislature impliedly approved this interpretation when it re-enacted the statute without substantive change. This argument fails because there was no consistent application of the purpose requirement among the courts of appeals. Just as many, if not more, cases during that time period did not require additional proof of intent to avoid child support. See, e.g., Roosth v. Roosth, 889 S.W.2d 445, 454 (Tex.App.-Houston [14th Dist.] 1994, writ denied); Kish v. Kole, 874 S.W.2d 835, 838 (Tex.App.-Beaumont 1994, no writ); Baucom v. Crews, 819 S.W.2d 628, 633–34 (Tex.App.-Waco 1991, no writ). Moreover, the doctrine of legislative acceptance is inapplicable when courts are presented with an unambiguous statute. See Fleming Foods of Tex., Inc. v. Rylander, 6 S.W.3d 278, 282 (Tex.1999).

4. At oral argument, James for the first time asked this Court to adopt a new standard, not found within the text of the statute or any case law: "intent to make less money." Because a person who is "intentionally unemployed or underemployed" can always be said to be acting with an "intent to make less money," the two are virtually synonymous. James also raised for the first time at oral argument his position that the Legislature's substitution of the term "intentional" for "voluntary" when enacting the 1989 version of section 154.066 requires courts to consider the motive behind the unemployment or underemployment. See Tex. Sup.Ct. Child Support Guidelines, R. 3(e), superceded by Act of May 12, 1989 71st Leg., R.S., ch. 617, § 6, 1989 Tex. Gen. Laws 2030, 2037. However, regardless of the use of "intentional" or "voluntary" as an adjective, there is no extra proof requirement in the statute that the unemployment or underemployment be for the purpose of avoiding child support. James's analogies to the definition of intentional murder in criminal law are inapposite. We also note that Black's Law Dictionary defines "voluntary" in terms of "intent." Black's Law Dictionary 1569 (9th ed.2009) (defining "voluntary" as "[d]one by design or intention").  We reject James's proposed interpretations to the extent there is any meaningful distinction.

<u>5.</u> According to the statutory scheme of the Texas Family Code, the same intentional unemployment/underemployment analysis under section 154.066 may be applied in both original child support orders and modifications of existing child support orders. See Tex. Fam.Code § 156.402 (allowing the court to consider "the child support guidelines . under Chapter 154 to determine whether there has been a material or substantial change of circumstances under this chapter that warrants a modification of an existing child support order if the modification is in the best interest of the child").

<u>6.</u> Some of the courts of appeals have applied a similar burden analysis under section 154.066. See, e.g., McLane v. McLane, 263 S.W.3d 358, 363 (Tex.App.-Houston [1st Dist.] 2008, pet. denied); In re E.A.S., 123 S.W.3d 565, 570 (Tex.App.-El Paso 2003, pet. denied); Zorilla v. Wahid, 83 S.W.3d 247, 253 (Tex.App.-Corpus Christi–Edinburg 2002, no pet.); DuBois v. DuBois, 956 S.W.2d 607, 610 (Tex.App.-Tyler 1997, no pet.).

<u>7.</u> Moreover, monthly child support awards are not without limits—the child support guidelines only apply to the first $7,500 of an obligor's net monthly resources. Tex. Fam.Code § 154.125.

<u>8.</u> See, e.g., In re B.R., 327 S.W.3d 208, 213 (Tex.App.-San Antonio 2010, no pet.); Romero v. Zapien, No. 13–07–00758–CV, 2010 WL 2543897, at *6 (Tex.App.-Corpus Christi–Edinburg June 24, 2010, pet. denied); Fondren v. Fondren, No. 09–08–00187–CV, 2009 WL 2045252, at *5 (Tex.App.-Beaumont July 16, 2009, no pet.); In re A.B.A.T.W., 266 S.W.3d 580, 585 (Tex.App.-Dallas 2008, no pet.); McLane v. McLane, 263 S.W.3d 358, 362 (Tex.App.-Houston [1st Dist.] 2008, pet. denied); Schaban–Maurer v. Maurer–Schaban, 238 S.W.3d 815, 826 (Tex.App.-Fort Worth 2007, no pet.); Beach v. Beach, No. 05–05–01316–CV, 2007 WL 1765250, at *4 (Tex.App.-Dallas June 20, 2007, no pet.); In re Marriage of Anderson, No. 10–06–00361–CV, 2007 WL 3409294, at *3 (Tex.App.-Waco Nov. 14, 2007, no pet.); In re S.C.S., 201 S.W.3d 882, 889 (Tex.App.-Eastland 2006, no pet.); Garner v. Garner, 200 S.W.3d 303, 306–07 (Tex.App.-Dallas 2006, no pet.); Logan v. Logan, No. 2–05–068–CV, 2006 WL 2167164, at *6 (Tex.App.-Fort Worth Aug. 3, 2006, pet. denied); Colvin v. Colvin, No.13–03–00034–CV, 2006 WL 1431218, at *5 (Tex.App.-Corpus Christi–Edinburg May 25, 2006, pet. denied); Gaxiola v. Garcia, 169 S.W.3d 426, 432 (Tex.App.-El Paso 2005, no pet.); In re A.J.J ., No. 2–04–265–CV, 2005 WL 914493, at *3 (Tex.App.-Fort Worth April 21, 2005, no pet.); In re J.C.S., No. 06–04–00085–CV, 2005 WL 927173, at *5 (Tex.App.-Texarkana April 18, 2005, no pet.); In re E.A.S., 123 S.W.3d 565, 570 (Tex.App.-El Paso 2003, pet. denied); In re Z.B.P., 109 S.W.3d 772, 783 (Tex.App.-Fort Worth 2003, no pet.); Zorilla v. Wahid, 83 S.W.3d 247, 253 (Tex.App.-Corpus Christi–Edinburg 2002, no pet.); Galarza v. Galarza, No. 13–99–797–CV, 2000 WL 35729667, at *2 (Tex.App.-Corpus Christi–Edinburg Nov. 30, 2000, no pet.); In re P.J.H., 25 S.W.3d 402, 405–06 (Tex.App.-Fort Worth 2000, no pet.); Snell v. Snell, No. 11–98–00126–CV, 1999 WL 33747973, at *2 (Tex.App.-Eastland Nov. 4, 1999, no pet.); DuBois v. DuBois, 956 S.W.2d 607, 610 (Tex.App.-Tyler 1997, no pet.); Woodall v. Woodall, 837 S.W.2d 856, 858 (Tex.App.-Houston [14th Dist.] 1992, no writ); Casterline v. Burden, 560 S.W.2d 499, 501 (Tex.Civ.App.-Dallas 1977, no writ); Anderson v. Anderson, 503 S.W.2d 124, 126 (Tex.Civ.App.-Corpus Christi 1973, no writ); McSween v. McSween, 472 S.W.2d 307, 310 (Tex.Civ.App.-San Antonio 1971, no writ).

Justice WAINWRIGHT delivered the opinion of the Court.

Exhibit C





*Overnight possession days based on the Leander ISD (Texas) school calendar for 2019.



# Children's Rights in Texas

**Request:** Please support legislation that mandates a rebuttable presumption that children of all ages have the inalienable right to have equal possession time with both fit parents.

**Problem:** The current Texas Family Code is outdated and does not reflect the norms of our society. For many decades, the current system has encouraged conflict between parents when it comes to custody of children. In almost all cases, where the parents do not agree on a possession and access schedule, the judge will use their discretion to determine which parent has the right to designate the primary residence of the child AND the right to receive child support based on the "best interest of the child." To sway the judge to rule in their favor, each parent embarks on a long and expensive court battle, slinging mud and highlighting the bad characteristics of the opposing party, all to obtain custody of the children. These custody disputes end up costing tens of thousands of dollars and effectively turn the children into pawns to control and alienate the other parent, which is child abuse. The divorce attorneys are the only winners under this system.

**Background:** In Texas, the rebuttable presumption is the Standard Possession Order (SPO) for children under 3 years of age. This allows the "losing" parent to have 2 hours every Thursday and 48 hours every 1st, 3rd, and 5th weekends (only 2 months/year have 5th weekends), a total of 104 hours per month during the school year. YES, a whopping 4 days and 8 hours! On average using 30 days per month, that means that the children only see their other parent 14.44% of the month. This is far from enough time for the children to form a healthy bond with the non-custodial parent.
For children over 3 years of age, the rebuttable presumption is the Expanded Standard Possession order. This allows the children to be with the "losing" parent every Thursday night and Sunday night when it falls on the 1st, 3rd, and 5th weekends. When calculating possession time on a nightly basis, this schedule allows the children 10 overnights per month with the "losing" parent (roughly 33% of overnights) during the school year.

**Facts of Standard Possession Order:** The charts below summarize the number of nights the children spend with each parent when the Standard Possession Order is utilized in Texas family courts. Clearly, the imbalance in parenting time can be seen on an annual basis at roughly 74% Custodial and 26% Non-Custodial. This imbalance is harmful to the children in the long-run because they are not able to form the healthy bond that they desperately need and desire. The non-custodial parent has no hope of being effectively involved in parenting a child with such a lopsided schedule.





**Facts of Expanded Standard Possession Order:** The charts below summarize the number of nights the children spend with each parent when the Expanded Standard Possession Order is utilized in Texas family courts. On an annual basis, the children will be with the custodial parent 57% of overnights and the non-custodial 43% of overnights. This is better than the SPO, however there is still an egregious imbalance between the custodial and non-custodial parenting times and rights. For example, the non-custodial parent cannot take their own child out of school for a doctor or dentist appointment, or even to lunch on the child's birthday, because their possession begins only when school is dismissed.





*Based on Leander ISD school Calendar

| | EQUAL PARENTING (proposed) | PRIMARY RESIDENCE (current) |
|---|---|---|
| **PARENTAL CONFLICT** | • Analysis of 50 North American studies conclude that equal parenting was associated with less parental conflict and less re-litigation (Bauserman 2012)<br>• With equal parenting neither parent's relationship with their child or their parental identity is threatened (Kelly 2007, Kruk1993b)<br>• Equal parenting counters the harmful effects of parental conflict (Fabricius, Diaz and Braver 2012, Pruett et al 2003) | • Parental conflict increases with primary residence arrangements (Bauserman 2012 and 2002, Melli and Brown 2008)<br>• Rank ordering of parents fuels discord (Warshak 2007)<br>• Unequal parenting arrangements are perceived as unfair and thus more likely to break down than equal parenting arrangements (Warshak 2007; Melli and Brown 2008; Brinig 2001) |
| **PARENT- CHILD BONDS** | • There is a direct relationship between quantity of time and quality of parent-child relationships (Amato and Dorius 2012; Lamb and Kelly 2009; Kruk 2010a; Fabricius et al 2010, Fabricius et al 2011)<br>• Attachment bonds are formed through participation in daily routines (Lamb and Kelly 2009; Fabricius et al 2010)<br>• Shared and equal parenting arrangements are stable over time (Berger et al 2008; Cashmore and Parkinson 2010; Brinig 2001) | • Primary residence arrangements highly correlated with parental alienation and parental disengagement (Kruk 2010a, Kruk 2010b, Amato, Meyers and Emery 2009)<br>• Children of primary residence arrangements spend 30% more time in substitute care (Melli and Brown 2008, Lamb and Kelly 2009)<br>• Closeness, warmth and mutual understanding are elusive within constraints of the traditional primary residence model (Smyth 2009) |
| **Lack of financial resources** | • In Australia, after equal parenting was implemented, 72% of parents now settle divorces without legal services (Kaspiew et al 2010; Kaspiew et al 2009) | • Scarcity of resources due to ongoing litigation accounts for much of the negative impact of divorce (Semple 2010) |

**Solution:** Bring Equality and Constitutionality into the Texas Family Code

1. The **Due Process Clause** of the 5th Amendment states "nor be deprived of life, liberty, or property, without due process of law."
   a. The current system deprives children and the non-custodial parent of proper due process.
   b. Child Protective Services understands and practices proper due process because they know the State may not deprive, impinge, remove, or otherwise harm or interfere with any natural parent's superior and preclusive constitutional rights to the custody of their direct blood offspring without first alleging and then proving, with clear and convincing evidence, that one or both parents is seriously unfit.
   c. In today's family court system, a judge, with the broad discretion of "the best interest of the child" (which cannot be consistently defined), can limit and or terminate a parent's right to their child without first alleging, and then proving serious parental unfitness, with clear and convincing evidence.
   d. With 50/50 equal parenting, a child's right to have equal access to both fit parents will not be impinged unless one or both parents is found seriously unfit, with clear and convincing evidence and with proper due process of law.

2. The **Equal Protection Clause** of the 14th Amendment states "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
   a. The current system deprives most fathers of Equal Protection.
   b. In today's family court system, there is clear gender discrimination. Statistics show that 85% of the time, the mothers are awarded custody and deemed the custodial parent. It is not because the fathers don't want to share their kids equally, it is because there is a true bias in the family court system throughout the State.
   c. With 50/50 equal parenting, each parent will have equal protection of the laws.

3. The **Equal Protection Clause** of the 14th Amendment also states that there shall not be unequal classes of citizens.
   a. The current system creates two separate classes of parents.
   b. In today's family court system, oftentimes there are two separate classes of parents: a custodial parent and a non-custodial parent. The custodial parent has more rights (right to determine residence, right to receive child support, right to take the child off school campus for lunch or doctor appointment, right to spend more time with the child, etc.) than the non-custodial Parent.
   c. With 50/50 equal parenting, neither parent will be a second-class parent.

4. Both the **5th Amendment** and **14th Amendment** state "nor be deprived of life, liberty, or property, without due process of law."
   a. The current system deprives the non-custodial parent of property, without due process of law.
   b. In today's family court system, when creating a custodial parent without proper due process, there is also typically a child support order that forces the non-custodial parent to pay the custodial parent a monthly amount or go to jail. This money is the property of the non-custodial parent.
   c. With 50/50 equal parenting, neither parent will be deprived of their property.

**DON'T BE DECEIVED!!!**
**5 BIGGEST LIES told by divorce attorneys and their lobbyist arm, the Family Law Foundation**
- Lie #1: It is harmful for the child to have equal time with two parents who are in conflict with each other.
- Truth: This conflict does not warrant restricting the child's equal time and equal rights to care, custody, control, and companionship of the parent. In fact, there is no scientific data to support that unequal parenting time benefits the child. Experts in the field have shown that equal parenting time is a huge benefit to children. There are many facts that support the idea of equal parenting plans being beneficial to the overall wellbeing and happiness of children. These studies also show more overnights also increases the overall parental commitment to children in a split family, resulting in healthier and committed relationships with both parents (4).
- Lie # 2: Judges know what is in the "best interest of the child."
- Truth: Hundreds of researchers agree the current Best Interests of Children Standard (BICS) should never have been applied to fit parents, only to abused or neglected children (4,5).
   ◦ The experts on the topic of BICS agree that it is an indefinite standard that actually increases the likelihood of conflict, participation in strategic bargaining by parents, broad character assassinations, and prolonged litigation.

- ◦ In fact, there is no objective or scientifically valid rules to determine best interests of children, when dealing with fit parents. This results in judges implementing their own bias (good, bad, or criminal) under the guise of the child's best interests with no data or documentation of reasoning to back up their rulings.
- Lie #3: Expanded Standard Possession is 47/53 and almost 50/50 so why bother changing the laws?
- Truth: Expanded Standard Possession is nowhere near 50/50. It sits right around 40/60, depending on the year and the school district the child resides (as illustrated on page 2).
- Lie #4: The Family Law Foundation will tell you that the 2-hour Thursday possession from 6 pm to 8 pm is a full day and that Friday from 6 pm to Sunday at 6 pm is 3 full days.
- Truth: There are exactly 22 hours difference between 2 hours and a full day. And last time we checked, 48 hours was still 2 days, not 3 days. The Family Law Foundation is misleading and intentionally fraudulent!
- Lie #5: The kids can't handle all of the back and forth with 50/50. They need a stable home.
- Truth: There are many ways to split child custody evenly, as illustrated below. However, with the current system, both SPO and Expanded SPO, the children are exchanged more times than the proposed Equal Parenting models of every other week, every other week + overnight, 3-3-4-4, and 2-2-5-5. See the chart below.



[1] Texas Department of Health and Human Services, http://dshs.texas.gov/chs/vstat/vs12/nnuptil.shtm

[2] Forbes and Divorcestatistics.com estimate average divorce cost at $15,000 and US is a $28 Billion divorce Industry

[3] Department of Health and Human Services Administration for Children and Families, Justification of Estimates for Appropriation Committees 2017, https://www.acf.hhs.gov/sites/default/files/olab/final_cj_2017_print.pdf

[4] Social Science and Parenting Plans for Young Children: A Consensus Report; Warshak, R.; American Psychological Association; Psychology, Public Policy, and Law; 2014, vol 20 No.1 , pp 46-47

[5] Securing Children's Best Interests While Resisting the Lure of Simple Solutions; Warshak, R.; Journal of Divorce and Remarriage, 56:57-79, 2015

PRESS FIRMLY TO SEAL

PRIORITY MAIL LEGAL
SIZE POSTAGE REQUIRED



**UNITED STATES POSTAL SERVICE.**

Retail

**US POSTAGE PAID**

**$7.75**

Origin: 79762
03/25/20
4865570498-09

**PRIORITY MAIL 2-DAY ®**

1 Lb 1.90 Oz

1006

EXPECTED DELIVERY DAY: 03/27/20

C091

SHIP
TO:
200 E WALL ST
STE 222
MIDLAND TX 79701-5201

**USPS TRACKING® NUMBER**

9505 5158 8493 0085 4908 39

RECEIVED

MAR 26 2020
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS



0001000060

Legal Flat Rate Envelope
EP14L February 2014
OD: 15 x 9.5

**PRIORITY** ★ MAIL ★

**UNITED STATES POSTAL SERVICE®**
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM: *Carlos Flores*
*6130 Fig St. #4*
*Odessa, TX 79766*

TO: *U.S. District Clerks Office*
*200 East Wall, Room 222*
*Midland, TX 79701*

Label 228, March 2016        FOR DOMESTIC AND INTERNATIONAL USE



**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

**UNITED STATES POSTAL SERVICE®**